In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00168-CV


______________________________




EDWARD CHARLES STRATHER, Appellant



V.



DOLGENCORP OF TEXAS, INC., 


D/B/A DOLLAR GENERAL STORES, Appellee




 


On Appeal from the 5th Judicial District Court


Cass County, Texas


Trial Court No. 2000-C-533




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 Edward Charles Strather appeals the summary judgment granted in favor of Dolgencorp of
Texas, Inc., an entity which owns and operates Dollar General Stores in Texas. Strather, an
independent truck driver, sued Dolgencorp alleging its employees were negligent in loading a trailer
he hauled from Oklahoma to Texas. He alleged that, while he was unloading the trailer, a heavy box
of glass containers of coffee fell onto his head from the upper part of the stacked boxes. 

 Dolgencorp filed a motion for summary judgment contending (1) there was a defect in the
parties because it was not liable in the capacity in which it had been sued, and (2) the statute of
limitations barred Strather's suit. As summary judgment proof, Dolgencorp attached the affidavit
of Michelle Hughes, an employee in the Risk Management Division of Dollar General Corporation,
who is responsible for handling claims on behalf of Dolgencorp. In her affidavit, Hughes states that
"[n]o employee of Dolgencorp was involved in the loading or preparation of the trailer." Dolgencorp
also attached excerpts from Strather's deposition, in which he testified the trailer was closed and
sealed when he picked it up. Finally, Dolgencorp attached Strather's petition, which was filed on
April 14, 2000, and which alleged he was injured on April 13, 1998.

 In response to Dolgencorp's motion, Strather attached his own affidavit, in which he states
he picked up the trailer on April 13, 1998, but was injured on April 14, 1998. He also states that
when he picked up the trailer "it was represented to [him] that . . . Dolgencorp . . . was responsible
for the loading of the trailer," that the trailer "was at a property controlled and operated by
Dolgencorp," and that "to [his] knowledge" Dolgencorp owned the trailer. He further states that the
warehouse where the trailer was located had numerous signs in the area that read "Dollar General." 
Strather also amended his petition to clarify that his injury occurred April 14, 1998.

 The trial court sent a letter to the parties in which it stated it was granting Dolgencorp's
motion because "the Summary Judgment evidence contained the Affidavit that no employee of the
Defendant loaded the trailer tractor [sic] in question," and "[t]here is no competent Summary
Judgment evidence to the contrary." The trial court later signed an order that did not recite its
reasons for granting summary judgment.

 Strather raises two issues on appeal: "Whether the trial court erred in granting the judgment
by holding that Appellant did not produce summary judgment proof that raised a fact issue in
avoidance of Appellee's affirmative defense? [and] . . . Whether the trial court erred in granting final
summary judgment as to all causes of action originally alleged against Appellee?"

 Dolgencorp moved for summary judgment under Tex. R. Civ. P. 166a(b). To prevail on such
a motion, the movant must establish that there is no genuine issue of material fact and that the
movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Summary judgment for
a defendant is proper when the defendant negates at least one element of each of the plaintiff's
theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. 
Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant. Rhone-Poulenc, Inc. v. Steel,
997 S.W.2d 217, 223 (Tex. 1999). We indulge every reasonable inference and resolve any doubt
in the nonmovant's favor. Id. On appeal, the movant still bears the burden of showing that there is
no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Id.

 Strather first contends the trial court erred in granting summary judgment because his
affidavit provided summary judgment proof by raising a fact issue concerning Dolgencorp's
affirmative defense. Dolgencorp contends that Strather's affidavit is incompetent summary judgment
proof and that the trial court so found when it stated in its letter to the parties that there was no
competent summary judgment proof to contradict Hughes' assertions in her affidavit.

 Strather's issue on appeal relates only to Dolgencorp's "defective parties" defense. As
mentioned previously, Dolgencorp had also moved for summary judgment on the basis of the statute
of limitations.

 When the trial court does not specify on what basis it granted summary judgment, the
appellant must argue that every ground in the summary judgment motion is erroneous. 
Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995); Simmons v. Healthcare Ctrs. of Tex.,
Inc., 55 S.W.3d 674, 680 (Tex. App.-Texarkana 2001, no pet.). Strather raises a specific, rather than
a general, point of error. When an appellant uses specific points of error or issues on appeal to attack
a summary judgment and fails to attack one of the possible grounds on which the judgment was
granted, the summary judgment must be affirmed. (1) Malooly Bros., Inc. v. Napier, 461 S.W.2d 119,
121 (Tex. 1970); Simmons, 55 S.W.3d at 681. This is because the summary judgment may have
been based on a ground that was available to the trial court and not specifically challenged by the
appellant on appeal. Malooly Bros., Inc., 461 S.W.2d at 121; Simmons, 55 S.W.3d at 681.

 Arguably, the above rule should not apply under the present circumstances because Strather
amended his petition to remove the defect about which Dolgencorp complained in its summary
judgment motion before the trial court ruled on the motion. It is not uncommon, however, for a
party, in order to avoid summary judgment, to amend his or her pleadings in response to a motion
for summary judgment.

 Were we to remove Strather's burden of attacking each of the possible grounds for granting
summary judgment by simply referencing his amended pleadings and assuming the trial court could
not have granted summary judgment in light of those amended pleadings, we would effectively be
placing ourselves in the role of the trial court in ruling on the motion for summary judgment. We
would be assuming the trial court did not rule-either correctly or incorrectly-on the motion it had
before it. We decline to set such a precedent, especially because the burden of attacking each
possible ground alleged in the summary judgment motion is relatively light.

 In the present case, however, the trial court arguably did state its reasons for granting
summary judgment in the letter it sent to the parties. But these statements were not contained in the
order granting summary judgment and are in the nature of findings of fact and conclusions of law,
which  we  are  precluded  from  considering.  See  Simmons,  55  S.W.3d  at  680;  Williams  v.
Moores, 5 S.W.3d 334, 336 (Tex. App.-Texarkana 1999, pet. denied). Rather, we must look only
to the order granting summary judgment, in which the trial court did not provide the reasons for its
ruling. Simmons, 55 S.W.3d at 680; see also Stevens v. State Farm Fire & Cas. Co., 929 S.W.2d
665, 669 (Tex. App.-Texarkana 1996, writ denied) (court of appeals could not consider trial court's
letter stating its reasons for granting summary judgment because letter was not part of judgment).

 Dolgencorp raised the statute of limitations as a basis for granting summary judgment. 
Because Strather does not attack Dolgencorp's statute of limitations defense, either through a general
or specific point of error or issue on appeal, we must affirm the summary judgment.

 The same reasoning applies to Strather's second issue on appeal, in which he contends the
trial court erred in granting summary judgment with respect to three of his theories of liability,
because Dolgencorp's summary judgment proof does not address those theories. In his petition,
Strather alleged that Dolgencorp failed to properly train its employees, servants, and agents in the
appropriate procedures to follow in loading trailers; that Dolgencorp failed to reasonably supervise
the loading of the trailer; and that Dolgencorp failed to reasonably inspect the loading of the trailer. 
He contends Hughes' affidavit, which states that no employee of Dolgencorp was involved in the
loading or preparation of the trailer, does not provide summary judgment proof to negate these
theories.

 Even if Strather is correct, he fails to attack Dolgencorp's statute of limitations defense,
which entitles it to summary judgment notwithstanding these theories of liability. Therefore, we
must affirm the summary judgment.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: July 16, 2002

Date Decided: September 11, 2002


Publish
1. A general point of error or issue on appeal allows a court of appeals to review all possible
grounds on which summary judgment may have been granted. Malooly Bros., Inc. v. Napier, 461
S.W.2d 119, 121 (Tex. 1970). A general point or issue states, "The trial court erred in granting the
motion for summary judgment," or uses similar language. Id.



d="false" Priority="63" SemiHidden="false"
 UnhideWhenUsed="false" Name="Medium Shading 1 Accent 3"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00131-CV

                                                ______________________________

 

 

 

                    IN THE INTEREST OF E.N.C., J.A.C., S.A.L.,
N.A.G., 

                                            AND C.G.L., CHILDREN

 

 

 

                                                                                                  


 

 

                                       On Appeal from the 62nd
Judicial District Court

                                                             Lamar County, Texas

                                                            Trial
Court No. 78207

 

                                                           
                                       

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter

                              Concurring and Dissenting Opinion by
Justice Moseley








                                                      MEMORANDUM OPINION

 

            As a result of a termination
proceeding brought by the Texas Department of Family and Protective Services
(Department), the parental rights of mother Edna Lopez to her five children
E.N.C., J.A.C., S.A.L., N.A.G., and C.G.L., and Francisco Lopez to his two
children S.A.L. and J.A.C., were terminated. 
Edna and Francisco argue that the evidence was insufficient to establish
by clear and convincing evidence that the statutory grounds for termination had
been met, or that termination was in the best interests of the children.  Edna also complains that the trial court
erred in allowing her counselor to testify in favor of the Department over
assertions of counselor/patient privilege.  We affirm the trial courts judgment. 

I.         FACTUAL AND PROCEDURAL HISTORY

 

            Thirty-one-year-old Edna has a seventh grade education,
can barely read or write, and was unable to obtain a GED.  She has not worked in six or seven years and
has had no income since her disability was cut off in 1999.  Since 1999, she worked only once because I
was too slow, not fast enough, and I was too short to lift up the heavy stuff.  Edna eats because me and my mother gets food
stamps.[1]


            Edna had her
first child, E.N.C., at the age of seventeen. 
Thereafter, she met Francisco, married him, and gave birth to J.A.C. and
S.A.L.  Edna and Francisco lived together
for eight to nine years before he was deported to his hometown of San Miguel
de Allenda, Mexico.  Thereafter, Edna had
N.A.G. with another man.  

            In 2009,
Kimberly Bullard with Child Protective Services (CPS) received a referral that
Edna gave Tylenol PM to her children and [was] taking medications that did not
belong to her.[2]  At the time of the referral, Edna was
pregnant with C.G.L., who was born prematurely on February 10, 2009, and
weighed just over three pounds. 
According to the Department and CPS supervisor Melinda Johnson:

[W]hen
[Edna] went to the hospital to take the baby home, she appeared to be under the
influence of drugs which caused her to behave erratically.  During an investigation it was found that
[Edna] was under the influence of an unknown substance either from
prescriptions prescribed for her mother or other unknown sources.

 

            Edna began
having migraine headaches four to five years ago.  Dr. Donna Womack, who treated Edna while she
was on Medicaid, prescribed a barbiturate used to treat migraine headaches
called butalbital.  Although Edna claims,
I aint never used drugs drugs, she admitted to abusing butalbital without
a prescription.  At some point, Edna was
no longer eligible for Medicaid, but in January or February 2009, Edna stated
she was prescribed twenty butalbital pills at the emergency room and was
abusing it . . . I was taking more than one . . . [a]bout three or four,
approximately every day.  When her mother
received her butalbital pills, Edna would sneak hers, stole hers without her
knowing.    

            CPS referred
the case to Family Based Safety Services (FBSS).  Bullard testified, The initial concerns was,
of course, substance abuse.  We were also
concerned about several people coming in and out of the home that she might not
have known. . . . We had concerns about her financial stability and herher use
of prescription medications that did not belong to her.  Edna was also on community supervision for
possession of marihuana at the time.  According
to Bullard, Edna reported that three different men could have been C.G.L.s
father, and Ednas little [knowledge] about men that have lived in the home
with her, and us not being able to locate them [wa]s a great concern for these
children.  

            Edna agreed
to attend weekly counseling, undergo a psychological evaluation, attend
parenting classes, and have her home monitored by case worker Mary Beth Gimbel.  She was also to complete a drug assessment
through the East Texas Council on Alcohol and Drug Abuse (ETCADA).  However, Edna did not begin her FBSS services,
and on April 5, 2009, she was arrested for DWI with child passenger S.A.L.  On this date, Edna was under the influence of
butalbital.  

            The original
petition for protection of the children and suit affecting parent-child
relationship was filed by the Department, and on April 6, 2009, the Department
was made temporary sole managing conservator. 
At that point, because there were no family members that were willing to
take the children, CPS had an emergency removal of the children and they went
into foster care, with the initial goal of family reunification.  Edna was able to visit with the children
every Thursday for one hour. 

            Francisco
was deported after an attempt to obtain a green card because he had failed to
complete Wisconsin community supervision for an offense involving an underage
girlfriend before he moved to Texas and met Edna.  After his deportation, Francisco kept in
touch with his children and claimed to provide for their needs.  He arranged for his father, Alvaro Lopez, who
lived in Texas, to buy the children items they needed.  Francisco would then reimburse his father by
giving the money owed to his mother, who lived in Mexico.  Francisco also mailed clothes to the
children.  This arrangement continued from
the date of his deportation, approximately five years ago.  Because Francisco was in Mexico, CPS did not
create a service plan for him.  However,
he participated in child visitation through telephone calls. 

            In May 2009 CPS
prepared a new family service plan for Edna having a goal of family reunification.  Pursuant to court order, Edna and Francisco
were to comply with each requirement set out in the Departments original, or
any amended, service plan during the pendency of this suit.  Among other requirements in the May service
plan, Edna agreed to:  (1) participate
in counseling with Ronikaye Rusak at Counseling Professionals of Northeast
Texas; (2) follow Rusaks recommendations; (3) participate in parenting classes
given by Rusak; (4) participate truthfully in a drug assessment with Rusak and
follow her recommendations; (5) provide the Department with Health,
Social, Education, and Genetic History (HSEGH) forms by May 7, 2009; (6)
undergo random drug testing; (7) keep a calendar of dates for her appointments
with counseling, parenting and visitation schedule, and provide 24 hour
notice to Kimberly Bullard in the event that she must cancel any appointment;
(8) refrain from taking prescription medication not prescribed to her; (9) not
introduce the children to men she decides to interact socially with . . . [and]
not allow men to live with her throughout the life of this case; and (10) maintain
financial stability and/or employment in order to be able to provide food,
clothing, and a safe appropriate home. 
The May service plan was adopted by the court, and Edna was ordered to
comply.  

            Bullard
testified that Edna participated in counseling with Rusak, completed the
parenting course, drug assessment, HSEGH forms, and underwent random drug
testing.  Court Appointed Special
Advocate (CASA) Mary Epps testified that Edna attended each and every visitation
and that the children were always glad to see her.  However, according to Bullard, Edna missed a
lot of services or counseling appointments that she did not notify me of, never
fulfilled the agreed upon ETCADA assessment at the beginning, which was also a
condition of probation, failed to keep a calendar of services, had a new
boyfriend who admitted he was introduced to the children during visitations,
and had not found employment.   

            On July 9,
2009, Edna was arrested again for DWI by ingestion of hydrocodone which she had
obtained from the emergency room for a twisted ankle, and her drivers license
was suspended.  She served thirty days in
jail and was released on August 7, 2009. 
Although her license was suspended, Bullard and Epps testified they
witnessed Edna drive herself to visitation several times.  In October 2009, Edna was recommended to an
outpatient program at Sabine Valley which she completed in January 2010.  Epps testified that before Christmas 2009,
Edna attended visitation wearing her sunglasses.  Mary claimed Edna actually stumbled over a
couple of chairs trying to get to the table. 
And she was really screaming and hollering at [Franciscos father
Alvaro].  

            Despite
Ednas mishaps with regard to the service plan, the Department decided to
recommend a monitored return of the children during a February 2010 hearing in
front of the trial court.  However,
Bullard testified that when she arrived for the hearing, Edna was slurring her
speech and was stumbling a little bit, walking across the room.  When questioned, Edna initially denied any
drug use, and when pressed, admitted to ingesting NyQuil, Stacker 3, which is
a diet supplement that you get over the counter, and an off-brand of Benadryl.  Becoming informed of Ednas condition, the
trial court ordered her to immediately take a drug test before the children
were returned to her.  Edna failed the
test; the result was positive for barbiturates, and she admitted that she did
not have a prescription for the drug.  

            After the failed
drug test, Bullard testified Edna did not attend weekly counseling, did not
complete the conditions of her DWI community supervision, did not maintain
stable housing with working utilities, did not seek employment, and did not go
to the literacy program.  One time during
visitation, Bullard stopped her and talked with her some more about her case
things, and sheshe becameshe was shaking, her eyes werewere glassy, her
speech became slurred.  And even walking
her out of the building, her motions became a little bit slower than normal.  A motion to revoke her DWI community
supervision, containing allegations that Edna failed to complete her DWI
education program, failed to report in person, used drugs, and was behind on
her fees was filed in March 2010.  

            After one
six-month extension, the trial court determined that the date of dismissal for
the cause would be on October 9, 2010.  A
few days before the dismissal date, the trial court heard evidence from Edna,
her boyfriend, Jim Hale, Francisco, Lopez, Rusak, Bullard, Epps, Johnson, and
C.G.L.s foster parent.  After hearing
recommendations regarding termination from several parties, the trial court
found that the Department met its burden of proof to demonstrate a statutory ground
justifying termination of parental rights and also found that termination of
both parents rights was in the childrens best interests.  

II.        STATUTORY
GROUNDS FOR EDNAS TERMINATION WERE MET BY CLEAR AND CONVINCING EVIDENCE

 

            Among other statutory grounds
under Section 161.001(1) of the
Texas Family Code, Ednas parental rights were terminated on grounds (E) and
(O).[3]  Tex.
Fam. Code Ann. § 161.001(1)(E), (O) (West Supp. 2010).  Specifically, the trial court found that she:

engaged
in conduct or knowingly placed the children with persons who engaged in conduct
which endangers the physical or emotional well-being of the children; . . . . [and]

 

failed
to comply with the provisions of a court order that specifically established
the actions necessary for the mother to obtain the return of the children who
have been in the permanent or temporary managing conservatorship of the
Department of Family and Protective Services for not less than nine months as a
result of the childrens removal from the parent under Chapter 262 for the
abuse or neglect of the children; 

 

Id.

 

            Edna argues
that the Department failed to prove these grounds by clear and convincing
evidence.  

            A.       Standard
of Review 

            

            A
parents rights to the companionship, care, custody, and management of his or
her children are constitutional interests far more precious than any property
right.  Santosky v. Kramer, 455 U.S. 745, 75859 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  Decisions from Texas courts show great
respect for the biological bond between parent and child, recognizing that the
natural right which exists between parents and their children is one of
constitutional dimensions.  In re J.W.T., 872 S.W.2d 189, 19495
(Tex. 1994) (quoting Wiley v. Spratlan,
543 S.W.2d 349, 352 (Tex. 1976)); In re
J.J., 911 S.W.2d 437, 439
(Tex. App.Texarkana 1995, writ denied). 
However, the Texas Supreme Court has also recognized that the rights of
natural parents are not absolute; protection of the child is paramount . . . . The
rights of parenthood are accorded only to those fit to accept the accompanying
responsibilities.  In re A.V.,
113 S.W.3d 355, 361 (Tex. 2003) (citing J.W.T., 872 S.W.2d at 195).  The childs emotional and physical interests
must not be sacrificed merely to preserve parental rights.  In re
C.H., 89 S.W.3d 17, 26 (Tex. 2002). 

            We strictly
scrutinize termination proceedings in favor of the parent.  In re
S.K.A., 236 S.W.3d 875, 900 (Tex. App.Texarkana 2007, pet. denied) (citing
Holick v. Smith, 685 S.W.2d 18, 20
(Tex. 1985).

            To terminate an individuals
parental rights to his or her child, the Department must prove, and the trial
court must find, by clear and convincing evidence, both of the following
statutory requirements:  (1) that the
parent has engaged in one of the statutory grounds for termination; and (2)
that termination is in the childs best interest.  Tex.
Fam. Code Ann. § 161.001 (West Supp. 2010); C.H., 89 S.W.3d at 23.  The
clear and convincing burden of proof has been defined as that measure or
degree of proof which will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Tex. Fam. Code Ann. § 101.007 (West 2008); C.H., 89 S.W.3d at 23.  Due process demands this heightened
standard.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  Thus, in reviewing termination findings, we
determine whether the evidence is such that a fact-finder could reasonably form
a firm belief or conviction about the truth of the States allegations.  C.H.,
89 S.W.3d at 25. 

            In a legal
sufficiency review, termination findings are given appropriate deference.  See   J.F.C.,
96 S.W.3d at 266; Smith v. Tex. Dept of
Protective & Regulatory Servs., 160 S.W.3d 673, 679 (Tex. App.Austin
2005, no pet.).  In such cases, we
consider all the evidence in the light most favorable to the findings to
determine whether the fact-finder could reasonably have formed a firm belief or
conviction that the grounds for termination were proven.  In re
J.P.B., 180 S.W.3d 570, 573 (Tex. 2005); J.F.C., 96 S.W.3d at 266.  We
assume that the fact-finder resolved disputed facts in favor of the finding if
a reasonable fact-finder could do so and disregard evidence that the  fact-finder may have reasonably disbelieved
or whose credibility may reasonably be doubted. 
J.P.B., 180 S.W.3d at
573.  We consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable fact-finder could,
and disregard contrary evidence unless a reasonable fact-finder could not.  Id.  We must therefore consider all of the
evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the fact-finders
province.  Id. at 57374.

            The inquiry
in a factual sufficiency review is whether the evidence is such that a fact-finder
could reasonably form a firm belief or conviction about the truth of the States
allegations.  C.H., 89 S.W.3d at 28.  We
consider whether disputed evidence is such that a reasonable fact-finder could
not have resolved that disputed evidence in favor of its finding.  Id.  If, in weighing the disputed evidence, the
fact-finder could have reasonably resolved the conflicts to form a firm
conviction that the States allegations concerning the grounds for termination
were true, then the evidence is factually sufficient and the termination
findings must be upheld.  Id. at 1819; see also J.F.C., 96
S.W.3d at 266.  In applying this standard
in light of the clear and convincing language required by Section 161.001, we
must be careful not to be so rigorous that the only fact-findings that could
withstand review are those established beyond a reasonable doubt.  In re
R.A.L., 291 S.W.3d 438, 443 (Tex. App.Texarkana 2009, no pet.) (quoting In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006)). 

            Only
one predicate finding under Section 161.001(1) of the Texas Family Code is
necessary to support a judgment of termination when there is also a finding
that termination is in the childs best interest.  A.V.,
113 S.W.3d at 362; In re K.W., 335
S.W.3d 767, 769 (Tex. App.Texarkana 2011, no pet.); In re N.R., 101 S.W.3d 771, 775 (Tex. App.Texarkana 2003, no
pet.).  If multiple predicate grounds
are found by the trial court, we will affirm based on any one ground because
only one is necessary for termination of parental rights.   K.W., 335 S.W.3d at 769. 

            B.        The
Evidence Was Sufficient to Meet Ground (E) 

 

            Ground (E)
alleged that Edna engaged in conduct which endangered the physical or emotional
well-being of the children.  Endanger means
to expose to loss or injury.  In re N.S.G., 235 S.W.3d 358, 367 (Tex.
App.Texarkana 2007, no pet.) (citing Tex.
Dept of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987)).   This statutory ground for termination refers
only to the parents conduct, as evidenced not only by the parents acts, but
also by the parents omissions or failures to act.  Id. at
36667 (quoting In re S.K., 198
S.W.3d 899, 902 (Tex. App.Dallas 2006, pet. denied)).  The conduct to be examined includes what the
parent did both before and after the child was born.  Id.  To
be relevant, the conduct does not have to have been directed at the child, nor
must actual harm result to the child from the conduct.  Perez
v. Tex. Dept of Protective & Regulatory Servs., 148 S.W.3d 427, 436
(Tex. App.El Paso 2004, no pet.) (citing Dupree
v. Tex. Dept of Protective & Regulatory Servs., 907 S.W.2d 81, 84
(Tex. App.Dallas 1995, no writ); N.S.G.,
235 S.W.3d at 367).  Termination for
indirectly endangering a child under this ground must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  Perez, 148 S.W.3d at 436 (citing In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.Eastland 1999, no pet.)); see Boyd, 727 S.W.2d at 533; N.S.G., 235 S.W.3d at 367.  The specific danger to the childs
well-being need not be established as an independent proposition, but may be
inferred from parental misconduct.  Perez, 148 S.W.3d at 436 (citing N.K., 99 S.W.3d 295, 300 (Tex. App.Texarkana
2003, no pet.)).

            Drug
addiction and its effect on a parents life and ability to parent may establish
an endangering course of conduct by a parent sufficient to support a petition
to terminate parental rights.  Perez, 148 S.W.3d at 436.  A
parents failure to remain drug-free while under the Departments supervision
will support a finding of endangering conduct under subsection (E) even if
there is no direct evidence that the parents drug use actually injured the
child.  In re J.A.W., No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.Fort
Worth Mar. 5, 2009, no pet.) (mem. op.) (citing Vasquez v. Tex. Dept of Protective & Regulatory Servs., 190
S.W.3d 189, 196 (Tex. App.Houston [1st Dist.] 2005, pet. denied)). 

            The Department argues that Ednas
abuse of butalbital, incarceration, and history of irresponsible choices endangered
the childrens physical or emotional well-being.  Edna responds that she was a poor person who
controlled her back pain with pain pills because she could not get any medical
attention.  Aiding the trial courts
determination in resolving this matter is the history of alleged addiction
outlined below. 

            Edna
had no income and previously qualified for Medicaid.  She was legitimately prescribed butalbital by
her physician four to five years ago for migraine headaches.  When her Medicaid ran out, Edna had no
insurance.  Over her lifetime, Edna
visited the emergency room over ninety-nine times.  Edna admitted that after her prescription
butalbital ran out, she would take her mothers without consent.  After C.G.L.s birth in February 2009, Edna
was prescribed hydrocodone.  Edna
testified,

When I finished with that, a monthalmost a month
after the baby was born, I still have problem in my back.  They thought the baby was on my nerves, but
it never went away so I hadI made an appointment with Dr. Nelson.  He done a MRI, which from the beginning he
gave me some pain pills because I was hurting real bad in my right side. . . . And
he done an MRI on me and it came back I had a spot about like this big down in
here. 

 

She was given hydrocodone 10s every month. 

 

            In April
2009, when she was first arrested for DWI with a child passenger,[4]
Edna claimed that she had been drugged by a man named Tim Austin who lived with
her in her mothers home.  She explained

Sunday,
[Austin] had got a woman called up CVS, pretend they me and got my moms
medication filled and he went up there and picked it up. . . . That night
before I left to go to the storeme and my daughter.  We was heading to the store to get gas and
get the formula for the baby.  My doctor
prescription was in the house.  I found
out that he had put eight pills in my Dr. Pepper bottle, like two hours before
I left . . . he sat there and bragged about it. 
He said it . . . I drank the Dr. Pepper way before I left.  When it kicked in so quickhe put seven,
eight pills.  It kicked in real quick. .
. I was fine when I pulled out of my driveway, but once I got to the stop sign,
turned, and the cop pulled me over after when I started gettingwalking toward
the backthats when I started getting dizzy. 


 

Ednas monthly hydrocodone prescription continued until her
Medicaid was cut off in June 2009.  That
same month, she visited the emergency room for sinus pressure and was given a
one-month supply of Darvocet for the pain in my ears.  

            In
July 2009, when Edna was pulled over the second time for DWI, Edna was taking hydrocodone,
for which she had been given a prescription by the emergency room physician for
a twisted ankle.  When she showed up
under the influence in February 2010, Edna claimed that she did not knowingly
ingest a barbiturate.  She explained that
she had a headache and took NyQuil and asked her cousin for aspirin or
Tylenol.  Later, due to her cough, she
took two little white pills I got from my cousin. 

            Recognizing
that she suffered from an addiction, Edna testified, In the past, yes, I did
have a drug problem.  But I got myself
straightened up.  She also stated, Im
the one that took the pills.  And I
regret it.  And Im going to always be an
addict.  And Im going to rehab to get
help.  At the time of the trial in
October 2010, Edna was in an inpatient drug treatment program.  Edna claimed that she had not used drugs
since February 2010.  A March 2010 and
July 2010 random hair and urine drug test were both negative.  Yet, her psychologist, Rusak, claimed that when
Edna arrived for her March 3, 2010, appointment forty-five minutes late, her
hands were shaky and her eyes were glassy, and Rusak testified that when Edna
appeared, I noted in here that her hands were shaky.  Rusak stated that there were no issues with
Ednas balance or speech during this meeting. 
 

            Also,
imprisonment is certainly a factor to be considered by the trial court on the
issue of endangerment.  N.S.G., 235 S.W.3d at 367.  The trial court noted that Edna was subject
to a pending motion to revoke community supervision.  The motion included allegations that Edna did
not pay fees as ordered; failed to report in July 2009, November 2009, and
February 2010; did not complete her DWI education program; and used drugsan allegation
developed in light of the courts February 2010 drug test.  Also, according to Bullard and Epps, Edna
continued to drive to parent-child visits on a suspended license, despite
warnings from Bullard that she could be arrested for such conduct.  

             There is evidence that Edna was ingesting some
form of pain medication until at least February 2010; the trial court was
authorized to disbelieve that this was not her voluntary act.  Edna had been arrested for DWI twice and had tested
positive for barbiturates on the day her children were going to be returned to
her.  Edna admitted that she will always
be an addict.  In March 2010, her
counselor testified that Edna appeared to be under the influence.  Although she was accepted to an inpatient
drug treatment program which she was attending at the time of trial, she had
not completed the program.  Also, due to
her positive drug test, failure to report, and alleged noncompletion of DWI
courses, the trial court could consider the possibility that Edna could be
subjected to a second round of incarceration likely.  Viewing the evidence above in the light most
favorable to the finding of termination, the court could find that Ednas drug
addiction, combined with actions which subjected her to the possibility of further
incarceration, was a course of conduct that endangered the children.  We find the trial courts termination on
ground (E) was supported by legally sufficient evidence.  

            Looking at
the evidence in a neutral light, we further conclude the evidence was factually
sufficient to support termination under this ground.  [C]onduct that subjects a child to a life of
uncertainty and instability endangers the physical and emotional well-being of
a child.  Drug use and its effect on a
parents life and his ability to parent may establish an endangering course of
conduct.  N.S.G., 235 S.W.3d at 36768.  Although an excuse was provided for the first
DWI, in which there was a child passenger subject to physical danger, there was
no excuse for the second DWI.  Edna
stated she was taking hydrocone for a twisted ankle at the time.  The trial court could have found that Edna
knew the risk of driving under the influence and disregarded it.  Also, Edna engaged in conduct which could have
subjected her to further incarceration. 
The court could decide that Ednas activities resulted in uncertainty
and instability in the life of her children. 
Therefore, we find that the evidence could reasonably form a firm belief
that Ednas conduct endangered her children by clear and convincing evidence.[5]


            C.       The
Evidence Was Sufficient to Meet Ground (O)

 

            The trial court also found that
Edna failed to comply with her court-mandated service plan and that such
failure was a statutory ground supporting termination.  The Department conceded that Edna completed
parenting classes, the drug assessment, the HSEGH form, psychological
evaluation, and random drug testing, and demonstrated her parenting skills, but
complained that Edna failed to participate in counseling and follow Rusaks recommendations,
did not completely keep a calendar of dates for her appointments, took
prescription medication not prescribed to her, introduced the children to her so-called
boyfriend of four months, and failed to maintain financial stability and/or
employment in order to be able to provide food, clothing, and a safe,
appropriate home. 

            We
first address Ednas failure to maintain financial stability and/or employment
in order to be able to provide food, clothing, and a safe, appropriate home.[6]
 Edna testified, Im going to fight for
my disability and still put application for job.  Im still doing that, which I hadnt had no
luck.  She stated that her last
application for a job was six months ago at the Budget Inn.  In the previous year, she had tried motels
and fast food places, but never obtained employment.  She stated that she had been trying to find a
job since 1999, which prompted this discussion: 

            Q.        Been
trying to find a job since 1999?

 

            A.        Yeah.  I mean, I put application so often.  You go for a while, I wait a while, go do it
again.  Wait a while, do it again.  You dont want to do it every week same
place.  So, you know, I wait, you know,
get a space between each other, then go try again.  

 

            Q.        So
this is October 4, of 2010.  How many job
applications have you honestly filled out this year?

 

            A.        This
year, not that many. 

 

            Q.
       Two?

 

            A.        I
think it was about three.  Three or four.


 

            Q.        Do
you think thats making an effort to find a job?

 

            A.        Its
kind of hard to get out there, get around. 
Through first of year, being wintertime, its hard for me to walk
around.  I have a spot in my back I
cannot walk too far or stand up too long. 

 

CASA worker Mary Epps was concerned when Edna told her she
was not looking for a job and she was not planning on having a job.  

            Given the
evidence of Ednas lack of income, work history, attitude toward finding
employment, and the fact that she would be relying on other sources of income
to pay a month-to-month lease on the home she intended to occupy, the court
could have found by clear and convincing evidence that Edna failed to comply
with its order requiring her to maintain financial stability and/or employment
in order to be able to provide for herself and her children.   

            Next, Edna
was required to attend counseling on a weekly basis.  Edna acknowledged that she missed several
appointments, some due to transportation issues and others due to
incarceration.  Rusak testified, [O]ver
the course of a year and a half, she had twenty-three[7]
appointments and 11 no shows.  So there
was some consistency there for afor some time when I thought she was making
progress.  Rusaks opinion regarding
Ednas overall progress changed when, according to Rusak, Edna came to the
office drug induced and wearing sunglasses. 
Rusak noted [h]er eyes are glassy, pupils are small.  Rusak believed Edna required inpatient
treatment.  Edna was not accepted for
inpatient treatment because she denied recent drug abuse.  Rusak talked to her and . . . said:  Heres what you have to do.  You wouldnt had to have used a substance
within so long.  I think youre being
dishonest with your drug use, so heres the facts.  You know, go to the drug screening and do
what you need to do to get into drug rehab. 
Edna  was accepted into an
inpatient program on July 28, 2010.  In
Rusaks opinion, Edna was not very adamant about helping herself and the
bare minimum.  Edna acknowledged that
she was supposed to attend weekly counseling, and when asked why she missed six
sessions between April 20 and June 16, 2010a time when she was not
incarceratedshe simply answered, I dont remember back then.[8]   Based on this evidence, the trial court
could have found that Edna did not follow Rusaks recommendations to attend
weekly counseling. 

            Next,
Bullard testified that Edna did [n]ot completely comply with the requirement
to keep a calendar of appointments and notify her if she was unable to attend
the appointments.  I am not sure that
she kept a calendar of her appointments on her.  Edna also took barbiturates on February 10,
2010, which, by her own admission, she obtained from a relative.  Thus, she (allegedly unknowingly) ingested
prescription medication not prescribed to her. 

            Edna also
introduced the children to Jim Hale, who was described by Edna as her so-called
boyfriend of four months.  At the time
of trial, Hale was repairing a three-bedroom, two-story home for a landlord in
exchange for reduced month-to-month rent of $250.00.  Edna planned to live with the children in the
home if they were returned to her.  Both
Edna and Hale were listed on the lease. 
Hale testified he planned to begin living with Edna.  With respect to the relationship, however,
Edna stated, Were not rushing in.  Were
taking it slow.  Although Edna was to
refrain from introducing [the children] to those individuals that she decides
to interact socially with, Hale testified that he had been to every
parent-child visitation for the last four months and that the children know
him.  

            We find the
evidence legally and factually sufficient for the trial court to form a firm
belief or conviction that Edna violated its orders under the statutory (O)
ground of termination. 

III.      STATUTORY GROUND FOR FRANCISCOS
TERMINATION WAS MET BY CLEAR AND CONVINCING
EVIDENCE 

 

            Among other
grounds, Franciscos parental rights were terminated upon the finding that he engaged
in conduct which endangered the physical or emotional well-being of J.A.C. and
S.A.L.[9]  We review whether legally and factually
sufficient evidence supported this finding.  In termination cases, [w]hen there is
conflicting evidence, it is the province of the trier of fact to resolve such
conflicts.  Jordan v. Dossey, 325
S.W.3d 700, 713 (Tex. App.Houston [1st Dist.] 2010, pet. denied) (citing City of Keller v. Wilson, 168 S.W.3d
802, 820 (Tex. 2005)).  In every
circumstance in which a reasonable trier of fact could resolve conflicting
evidence either way, the reviewing court must presume it did so in favor of the
prevailing party.  Id.

            Prior to the
birth of the children, Francisco was placed on probation in Wisconsin because
he committed an offense involving an underage girlfriend.[10]
 Instead of completing his probation,
Francisco moved to Texas and married Edna. 
In 2004 or 2005, when he went to Dallas to inquire about obtaining a
green card, it was discovered that he had absconded supervision, which resulted
in his arrest and ultimate deportation to Mexico.  Although he wanted to return to the United
States, Francisco said he could not return for ten years.  He claimed that Edna was a good mother when
they were together and was surprised to discover her conduct.  

            Again, endangering
acts need not have been directed at the children, or have caused an actual
injury or threat of injury to the children to constitute conduct that endangers
their physical or emotional well-being.  In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).
 Conduct which occurred in the past which
exposed J.A.C. or S.A.L. to loss or injury can be considered.  N.S.G.,
235 S.W.3d at 367.  However, termination for
conduct indirectly affecting the child must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  Perez, 148 S.W.3d at 436; N.S.G., 235 S.W.3d at 367.  The conduct to be examined includes what the
parent did both before and after the child was born.  N.S.G.,
235 S.W.3d at 36667; In re J.T.G., 121 S.W.3d 117, 125 (Tex.
App.Fort Worth 2003, no pet.); see In re D.M., 58 S.W.3d 801, 808 (Tex.
App.Fort Worth 2001, no pet.) (It is inconsequential that the parental
conduct considered in a termination proceeding occurred before the childs
birth.).

            Francisco
was placed on probation for having an inappropriate relationship[11]
with an underage child who he referred to as his girlfriend.   The
trial court was free to determine that the inappropriate relationship
involving a minor implied more than a single act or omission.  This inappropriate relationship led to the
imposition of Wisconsin probation, and Franciscos conduct in absconding the
jurisdiction and violating the terms of his probation by moving to Texas
established a voluntary course of conduct. 
[I]ntentional criminal activity which expos[es] the parent to
incarceration is relevant evidence tending to establish a course of conduct
endangering the emotional and physical well being of the child.  Clawson
v. Tex. Dept of Protective & Regulatory Servs., No. 03-05-00116-CV,
2006 WL 2032270, at *4 (Tex. App.Austin July 21, 2006, no pet.) (mem. op.) (quoting
In re A.W.T., 61 S.W.3d 87, 89 (Tex.
App.Amarillo 2001, no pet.)); Allred v.
Harris County Child Welfare Unit, 615 S.W.2d 803, 806 (Tex. App.Houston
[1st Dist.] 1980, writ refd n.r.e.).[12]  Because Franciscos conduct led to his
deportation, it led to the physical loss of the childrens father figure.  While deportation alone cannot establish a
course of conduct endangering a child, it is a fact properly considered when
assessing endangerment.  See Boyd, 727 S.W.2d at 53334; D.M.,
58 S.W.3d at 808 (The State need not show incarceration was a result of a
course of conduct endangering the child; it need only show incarceration was
part of a course of conduct endangering the child.).  Therefore, the trial court could conclude
that the consequences of Franciscos criminal acts in the past subjected J.A.C.
and S.A.L. to a life of uncertainty and instability, endangering their physical
and emotional well-being.  N.S.G., 235 at 36768.  

            In
reviewing the evidence under a light most favorable to the ruling, and with
appropriate deference to the finder of fact, we conclude the evidence legally
sufficient to support termination under ground (E).  The trial court could have formed a firm
belief or conviction that this ground for termination was proven.           

            Also, there
are no undisputed facts in this analysis; there is only the argument that
Franciscos actions constituted a single act instead of a course of
conduct.  We will sustain a factual
insufficiency point only if the evidence was so weak or the evidence to the
contrary was so overwhelming that the fact-finder could not have reasonably
concluded there was a high probability that Francisco engaged in a course of
conduct which endangered the children.  D.M.,
58 S.W.3d at 808.  We cannot reach
such a conclusion with respect to this case. 
Therefore, we find the evidence was factually sufficient for the trial
court to have found that the Departments burden to prove a course of conduct
which endangered the children by clear and convincing evidence was met.[13]   C.H.,
89 S.W.3d at 28.  

IV.       SUFFICIENT EVIDENCE ESTABLISHED
TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN

 

            A.        The Holley
Factors 

 

            There
is a strong presumption that a childs interest is best served by preserving
the conservatorship of the parents; however, clear and convincing evidence to
the contrary may overcome the presumption. 
In re R.R., 209 S.W.3d 112,
116 (Tex. 2006).  In deciding whether
termination would be in the best interest of the child, the trial court may
consider this nonexclusive list of factors:  (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3) the
emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the acts
or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 37172
(Tex. 1976); K.W., 335 S.W.3d at
770.  Also, evidence offered to prove
grounds for termination, contact between the natural parent and child, degree
of financial support, quality of care rendered by a childs care giver, and
their willingness to adopt are all relevant to determining if the termination
is in the best interest of the child.  C.H.,
89 S.W.3d at 28; In re J.W.M., 153 S.W.3d 541, 54849 (Tex.
App.Amarillo 2004, pet. denied) (While the prospect of adoption into a stable
home cannot alone be said to be a determinative factor, it clearly is among the
factors the court properly could consider.).  It is unnecessary to prove all of these
factors as a condition precedent to parental termination.  C.H.,
89 S.W.3d at 27. 

            B.       Termination
of Ednas Parent-Child Relationship Was in the Childrens Best             Interests

 

            In this case, Epps testified
that E.N.C., the oldest child, did not want to return home to her mother in the
condition Edna was in.  Epps stated that
the other children old enough to speak wanted to be reunited with Edna.  The childrens ad litem attorney, Larry
Maninger, testified that the children, except for the seven-year-old, wanted to
be returned to Edna.  However, he also
testified, Theyve also made it very clear that they dont want to go back to
their mother unless their mother gets her problems resolved.  Franciscos father testified the children
desired to live with their mother.  We
find this factor weighs against termination. 

            The oldest
child in this case was fourteen at the time of trial, and the youngest child
was less than two years old.  The
emotional and physical needs of the children now and in the future are
great.  This factor weighs in favor of
termination. 

            With respect
to emotional and physical danger to the children, while the Department did not
prove the allegation that Edna gave the children medications that were not
age-appropriate,   Edna drove while under
the influence with S.A.L. in the car and appeared in court under the influence on
the day of the monitored return of the children.  The court could have found that Ednas drug
addiction, and possible future incarceration, presented emotional and physical
danger to the children now and in the future. 
This factor weighs in favor of termination.

            Ednas
parental abilities, aside from her addiction to drugs and driving while under
the influence, were good.  Bullard
testified that Edna always kept a clean and appropriate home for the children
and that the children were always happy to see Edna at parent-child visitations,
at which Edna acted appropriately.  Edna
saw that the children attended school and, although J.A.C. had trouble with
math, all of the children had passing grades. 
This factor weighs against termination. 

            Edna
planned to move into a three-story, two-bedroom house with the children if they
were returned to her, pending her completion of inpatient treatment and the awaited
outcome on the revocation of her community supervision.  Bullard testified the Departments plan was
to have the four older children remain together in foster care with the
Department named sole permanent conservator of the children.  The Department planned for C.G.L. to remain
with, and possibly be adopted by, her separate foster family.  Whereas Edna had lived in five residences in
the past eighteen months, Bullard described that the children were in a stable
environment in their foster home placement. 
As to C.G.L., foster parent Amber Mitchell testified that C.G.L. was
placed in her home when she was seven months old and has settled into her new
family of seven.  C.G.L. calls Mitchell
mama, Mitchell and her husband have the ability to support C.G.L., and Mitchell
testified they would adopt C.G.L. immediately if possible.  Mitchell testified, I think the best
interests wouldyou know, for her, for stability, for rights to be terminated
and if we were allowed to adopt so she can continue in the life shes known.  We find the plans for the children and
stability of the home or proposed placement factor neutral, with the exception
that as to C.G.L., the foster parents plan weighs in favor of
termination.  

            The acts
indicating that placement with Edna might not be a proper placement included
her problems with prescription drugs, her lack of income, and inability to
properly search for and obtain employment. 
This evidence could lead a fact-finder to believe that the childrens
needs would not be taken care of. 
Bullard also testified that Ednas conduct in allowing men to live with
her whom she did not know well also endangered the children.  This factor weighs in favor of termination.             

            We now
consider Ednas excuses.  Edna argues
that as of February 2010, she has remained drug free and thus, termination is
not in the best interests of the children. 
As stated in Jordan:

Although
evidence shows Jordan has made some recent improvements to her past situation,
those improvements cannot absolve her of her long history of irresponsible
choices.  See In re J.O.A., 283 S.W.3d at 346 (While the recent improvements
made by [appellant] are significant, evidence of improved conduct, especially of
short-duration, does not conclusively negate the probative value of a long
history of . . .  irresponsible choices.).

 

325 S.W.3d at 732.  Edna also argues that her lack of education
and misfortune with respect to medical problems should not be considered.  A parents lack of education, training, or
misfortune is considered when reviewing excuses for acts or omissions of a
parent; however, these considerations do not negate evidence tending to show
that termination is in the childs best interest.  Id. (citing
In re S.H.A., 728 S.W.2d 73, 8990 (Tex.
App.Dallas 1987, writ refd n.r.e.)). 

            With regard
to all of the children, Bullard testified, [T]heir placement should continue
as they are, and termination of parental rights should be granted at this
time because these children are in a stable environment in which theyre
thriving in and theyre growing.  To put
them back into a home in which nothings changed would create an environment in
which they could possibly digress from where they are now.  Maninger testified that he could not
recommend that the children be returned to Edna in her current state.  However, with the exception of C.G.L.,
Maninger recommended that Ednas rights not be terminated.  Epps also recommended termination.  

            Considering
the Holley factors, and in light of
all of the evidence, the trial court could have reasonably formed a firm belief
or conviction that termination of Ednas parental rights was in the best
interests of the children.  Therefore, we
conclude the evidence was legally and factually sufficient to support the courts
best-interest finding.  This point of
error is overruled. 

            C.
      Termination of Franciscos
Parent-Child Relationship Was in the Childrens Best Interests

 

            There was no
evidence that any of the children wanted to live with their father in
Mexico.  J.A.C. was twelve at the time of
trial, and S.A.L. was eleven.  The emotional
and physical needs of the children now and in the future are great.  The first two Holley factors weigh in favor of termination. 

            As far as
the emotional and physical dangers to J.A.C. and S.A.L. now and in the future,
Edna testified Francisco never endangered the children and was a good father.  She said Francisco raised E.N.C. and N.A.G.,
even though they were not his children.  Edna
stated that Francisco provided for his childrens physical needs.  [H]e does the best he can through his daddy
or whatever he can.  He does what he can
for his children and provides whatever I need.  If I need, say-- . . . when school first
starts, my children need shoes, backpacks, couple suit of clothes.  Their grandpa willactually its their dad
doing it, but either grandpa go to get it for them, and the dad reverses back
to their mom in Mexico because its easier that way.  From Ednas account, Francisco was a good
parent.  No evidence was presented
regarding his parental ability.  Also,
there was no testimony that the Department had programs available which could
assist Francisco in Mexico to promote the best interests of the children.  We find the third through fifth Holley factors weighs against
termination.     

            Although
Francisco testified, it appeared that he did not have a plan for J.A.C. and
S.A.L.  He stated that the children
should be with their mother.  The agency
planned for the four oldest children to remain together in foster care while
C.G.L. stayed with her foster family.  We
find this sixth factor weighs in favor of termination.  However, with respect to the stability of
Franciscos home or proposed placement of J.A.C. and S.A.L., no testimony was
presented.  Thus, the seventh Holley factor is neutral. 

            Franciscos
inappropriate relationship with a minor and resulting deportation for failure
to complete his probation indicated that the parent-child relationship might
not have been appropriate.  No excuse for
these acts was provided.  We find the
last two Holley factors weigh in
favor of termination. 

            Bullard
stated that because Francisco has not provided any financial support and had
not contacted the children, with the exception of a few telephone calls,
termination was recommended.  Epps and
Johnson also recommended termination. 
Even Franciscos father testified that it would be good for a married
couple to adopt J.A.C. and S.A.L. and feed and clothe them and provide them with
a good education.  

            Considering the Holley factors, and in light of all of
the evidence, the trial court could have reasonably formed a firm belief or
conviction that termination of Franciscos parental rights was in the best
interests of J.A.C. and S.A.L. 
Therefore, we conclude the evidence was legally and factually sufficient
to support the courts best interest finding. 
This point of error is overruled. 

V.       TRIAL COURT
DID NOT ERR IN ADMITTING RUSAKS TESTIMONY 

 

            In a separate
point of error, Edna argued that the trial court erred in admitting Rusaks
testimony over Rule 501 objections of privilege.  Tex.
R. Evid. 501.  The admission or
exclusion of evidence is a matter within the sound discretion of the trial
court.  City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); Hathcock v. Hankook, 330 S.W.3d 733, 740
(Tex. App.Texarkana 2010, no pet.).  A
trial court abuses its discretion when it acts without regard for any guiding
rules or principles.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 24142 (Tex. 1985); Hathcock,
330 S.W.3d at 740.  We must uphold the
trial courts evidentiary ruling if there is any legitimate basis for the
ruling.  OwensCorning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).

            As Rusak was about to testify, Edna
objected that she was not allowed toto testify as concerning any confidential
communication without her permission. 
The Department argued that Edna signed a waiver of privilege indicating
her consent for Rusak to consult Bullard. 
Edna also had signed a family service plan stating, I understand
information for the evaluation of my progress may come from any and all of the
following sources:  Me, family members,
Child Protective Service staff . . . and other agencies, individuals, and
community professionals.  Counsel for
Edna complained that her waiver authorizing communications from Rusak to Bullard
was specific to Ms. Bullard.[14]  The trial court found that because Edna
allowed Bullard to be privy to counseling sessions, she waived any
privilege.  

            Edna argues that the waiver was not
produced in evidence.  However, the
record of the proceedings indicate that the waiver was provided to counsel and [t]hats
what I just handed to you.  Rusak also
testified, [S]he did give me release to give information to her case worker
also in the intake.  In light of the
record, and possibility from the record that the waiver was available in the
courtroom, we find that the trial court did not err in finding a waiver of
privilege.  Ednas last point of error is
overruled.[15]
  

VI.      CONCLUSION 

 

            We affirm the trial courts judgment. 

 

 

            

                                                                                    Jack
Carter

                                                                                    Justice

 

 

                                    CONCURRING
AND DISSENTING OPINION

 

            Edna
Lopez and her children who were the subject of this suit first came to the
attention of the judicial system April 6, 2009, when an original petition was
filed by the Child Protective Services division of the Texas Department of
Family and Protective Services (CPS).  At
that time, Francisco Lopez[16]
was generically identified (with two others) as the father of the child, with
the observation that his address was not known.  An amended petition filed two days later
alleged Francisco to be the father of the male child born March 25, 1996, and
the female child born November 19, 1999; again, it was alleged that Franciscos
whereabouts were unknown.  An attorney ad
litem was appointed for Francisco and the alleged father of another of the
children; that attorney ad litem duly filed a response on Franciscos
behalf.  A family service plan, which
made no mention of Francisco, was filed May 29 and identified the goal of
the plan to be family reunification.  Francisco
was served by certified mail July 27, 2009. 
In a Permanency Plan and Permanency Progress Report filed by CPS
December 15, 2009, Francisco is mentioned as the father of the two children
mentioned previously with the notation that he cannot return to the United
States for ten years due to unnamed criminal activity while in this country,
but would continue to participate in monthly conference calls with the
children.  Each subsequent progress
report repeats the same information about Francisco verbatim.  There is no indication that any home study of
Franciscos home was conducted or that he was permitted to participate in any
plan dictated by the trial court or CPS at any time, except for the monthly
telephone calls previously noted. 

            Once CPS has
been appointed managing conservator of a child, Texas Family Code Section
263.401 contains very precise and explicit time limits on the judicial
involvement with the child. 
Specifically, it prescribes that on the first Monday after the first
anniversary of the date the court rendered a temporary order appointing the
department as temporary managing conservator, the court shall dismiss the suit
with the proviso that one 180-day extension of that one-year period can be made
if the court finds that extraordinary circumstances necessitate the child
remaining in the temporary managing conservatorship of the department and that
continuing the appointment of the department as temporary managing conservator
is in the best interest of the child.   Tex.
Fam. Code Ann. § 263.401 (West 2008).

            Here,
the first order appointing CPS as temporary managing conservator of the
children was entered April 9, 2009.  The
entry of this order thus would have dictated the first deadline of the first
Monday after April 9, 2010, for final determination, absent an extension.  Even with the 180-day extension that was
granted, CPS and the trial court were forced to take the fork in the road of
either terminating the parental rights or dismissing the case very shortly
after the date set for hearing.  Everyone
was operating under the statutory gun.

            The trial
court terminated Franciscos parental rights, finding that he had:  (1) knowingly placed or knowingly allowed the
children to remain in conditions or surroundings which endangered the physical
or emotional well-being of the children; (2) engaged in conduct or knowingly
placed the children with persons who engaged in conduct which endangers the
physical or emotional well-being of the children; (3) failed to support the
children in accordance with Franciscos ability during a period of one year
ending within six months of the date of the filing of the petition; and (4) constructively
abandoned the children who had been in the permanent or temporary managing
conservatorship of CPS or an authorized agency for not less than six months,
and (a) CPS or an authorized agency had made reasonable efforts to return the
children to Francisco; (b) Francisco had not regularly visited or maintained
significant contact with the children, and (c) Francisco demonstrated an
inability to provide the children with a safe environment.

            We must
remember that a court may order termination of the parent-child relationship only
if the court finds the allegations to be true by clear and convincing evidence.  Tex.
Fam. Code Ann. § 161.001 (West Supp. 2010).  The standard clear and convincing evidence is
defined as that measure or degree of proof which will produce in the mind of
the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.  Spangler v. Tex. Dept of Protective &
Regulatory Servs., 962 S.W.2d 253, 256 (Tex. App.Waco 1998, no pet.).  

            The majority
only addresses the finding that Francisco had engaged in conduct which
endangered the physical or emotional well-being of the children.  The majority correctly points out that this
conduct cannot be considered an isolated act but, rather, a voluntary,
deliberate, and conscious course of conduct. 
For this, the majority relies upon Franciscos rather foggy description
of what the majority calls an inappropriate relationship with a person whom
Francisco described as being underage. 
The evidence upon which this rests is the following exchange during the
trial.  On direct examination of
Francisco,[17] the following
exchange occurred:

            Q.        Okay.  Now, you got in trouble in Wisconsin, right?

 

            A.        Yes.  Correct.

 

            Q.        You were having  your girlfriend was
underage?

 

            A.        Yes.  Correct.

 

            That is the
sole source for the assumption that Francisco engaged in an inappropriate
relationship with a child.  One must
infer that there was an inappropriate relationship and simple inferences not
based on clear and convincing evidence will not support such a finding.  One could just as easily infer that he had a
young female friend to whom he had given a beer and was convicted of that
offensea much less serious offense.  At
any rate, Franciscos other testimony was that he had been placed on some kind
of probation for whatever offense he committed, but he failed to live up to the
terms of his probation and moved to Texas. 
After he had lived in Texas, he (rather naively) went to Dallas to apply
for legal residency status; when the prior criminal offense was discovered, he
was deported.  Of course, whatever
conduct Francisco perpetrated in Wisconsin occurred before he even met
Edna.  One must calculate, then, that
since the elder of the two children Francisco sired by Edna was over fifteen
years old at the time of trial, the incident for which he was convicted had
taken place not less than sixteen years before the time the order terminating
his parental rights was entered.

            The
commission of a very unclear offense (the gravity of which is unproven) and his
failure to live out the terms of a probated sentence over a decade and a half
before is hardly clear and convincing evidence that Francisco engaged in a voluntary,
deliberate, and conscious course of conduct which endangered the physical or
emotional well-being of his childrenchildren who were not even yet thought
about, much less conceived.  There is no
clear and convincing evidence here.

            As to the
other findings by the trial court upon which the termination was based, there
appears to be absolutely no evidence at all to support them.

            When one considers
the finding that Francisco knowingly placed or knowingly allowed the children
to remain in conditions or surroundings which endangered the physical or
emotional well-being of the children, Franciscos testimony that he believed
the children to have been in perfectly acceptable surroundings and that Edna
had not abused drugs or alcohol when they were together is not
controverted.  Francisco testified that
his father saw the children on many occasions and made no such report of
mistreatment, neglect, or maltreatment to him. 
Conversely, Francisco said that he thought (erroneously, it turns out)
that Edna was a good mother to the children. 
Erroneous information about children who are hundreds of miles away does
not constitute knowing conduct. 

            As to the
finding that Francisco failed to support the children in accord with his ability
during a period of one year ending within six months of the date of the filing
of the petition, the evidence is once again uncontroverted that Francisco
elicited the aid of his father (who apparently made regular trips in the area
in which the children were located) in delivering things to his children.  He would then reimburse his father by giving
his mother funds in Mexican currency. 
Francisco only made $400.00 per month, but asked if he needed to get a
second job to send more money than he had in the past.  There is a simple lack of any evidence that
Francisco was not supporting his children in accord with his ability to pay;
except for the testimony he provided as to his income, there is no other
evidence of ability (or inability) to pay. 

            There
is simply no evidence at all that the requirements of Section 161.001(a)(N) of
the Texas Family Code have been satisfied. 
To commence, although there is ample evidence that CPS had been
appointed temporary managing conservator of the children, there is simply no
evidence at all that Francisco constructively abandoned the children, that CPS
had made reasonable efforts to return the children to Francisco, or that there
was any evidence that he had demonstrated an inability to provide the children
with a safe environment, each of which is required to be proven.  There was no home study of Franciscos
situation and there was no attempt to return the children to him in the
record.  Francisco testified that he
spoke to the children on the telephone on a regular basis, but was constrained
from visiting them personally because he had been deported. 

            It is
obvious that Franciscos role in this trial was that of the forgotten man.  Perhaps if the State had truly considered his
role as the father of the children, it could have obtained copies of the
Wisconsin papers to affirmatively show what crime Francisco had committed
there.   It chose not to do that.  Was it a heinous crime?  Who knows?  Perhaps if CPS had considered the importance
rightly placed on the value of the parent and child relationship between
Francisco and his children, its agents would have seen to the commission of a
home study of Franciscos home.  It did
not.  Perhaps if some request for support
was made by CPS to Francisco during the time that the children were under CPS
conservancy, he would have provided what he could afford.  There is no evidence that this took place. 

            I would
affirm the termination of the parent and child relationship as to Edna, but I
would reverse the termination as it pertains to Francisco. 

 

 

                                                                                    Bailey
C. Moseley

                                                                                    Justice

 

Date Submitted:          June
29, 2011

Date Decided:             August
16, 2011

 

 











[1]Ednas
mother, Ruth Miller, is sixty-five years old and receives $674.00 social
security income per month.  





[2]Allegations
were also made against Edna in 2005, 2006, 2007, and 2008; those were
dismissed.  





[3]The
trial courts order of termination also listed Section 161.001(1)(D), (F), and
(P) as grounds for termination.  The
Department focuses on Section 161.001(E) and (O), and because we find the
evidence sufficient to prove these grounds of termination, we need not discuss
the remaining statutory grounds included in the courts order. 





[4]Edna
understood that she was putting S.A.L. in danger when she drove under the
influence of a prescription drug.  





[5]Moreover,
the specific danger to the childs well-being need not be established as an
independent proposition, but may be inferred from parental misconduct.  N.K.,
99 S.W.3d at 300.





[6]Edna
was never accused of failing to maintain an appropriate and clean home for the
children.  Bullard testified she had maintained
the home throughout most of the case. 
However, shes had, you know, some utilities cut off.  Shes had to move.  Theres stilltheres still great concern for
that.  At the time of trial, Edna was
living with her aunt in a trailer home, but hoped to move to a three-bedroom,
two-story home with her mother.  Gas and
water were turned on in the home, but electricity was not.  





[7]In
total, Edna had twenty-six appointments. 
Three appointments were kept with another counselor because Rusak was on
maternity leave.  





[8]Edna
points out that on February 10, 2010, the court found that she had demonstrated
appropriate compliance with the service plan, and on March 1, 2010, the
Department provided a permanency plan which stated Edna was continuing to
attend counseling.  Edna argues that the
Department judicially admitted compliance with the requirement that she attend
counseling. However, the Departments statement that Edna resumed her . . . counseling
. . . with counselor Ronikaye Rusak does not judicially establish that Edna
participated in counseling and followed Rusaks recommendations.  





[9]The
trial court also found that grounds (D), (F), and (N) of Section 161.001(1)
were met. 

 





[10]Beyond
this description, the actual offense is unknown.  The date of his Wisconsin conviction was not
introduced in evidence.  





[11]Evidence
as to how a parent has treated another child in the past is relevant regarding
whether a course of conduct under subsection (E) has been established.  See
Jordan, 325 S.W.3d at 724 (citing In
re D.T., 34 S.W.3d 625, 63637 (Tex. App.Fort Worth 2000, pet. denied)). 





[12]Deportation,
like incarceration, is a consequence of an action.  Thus, just as incarceration alone is not
enough to demonstrate a course of conduct that endangers the physical and
emotional well-being of the children, deportation alone is also not enough.  See
Adoption of Andreas, No. 10-P-817,
2011 WL 93040, at *3 n.4 (Mass. App. Ct., Jan. 11, 2011); In re M.R.G., No. 20080250-CA, 2008 WL
2224277 (Utah App. May 30, 2008).   





[13]Francisco
also argues that his counsel rendered ineffective assistance by failing to
include a complaint about the legal and factual sufficiency to support the
ground of termination that Francisco constructively abandoned his
children.  Section 263.405 of the Texas
Family Code requires a party appealing an order terminating a parent-child
relationship in a state-initiated termination proceeding to file a statement of
points on which the party intends to appeal [n]ot later than the 15th day
after the date a final order is signed. 
Tex. Fam. Code Ann. §
263.405(b)(2) (West 2008).  Although
counsel for Francisco filed a statement of points, the constructive abandonment
ground was not challenged.  Typically, we
may not address an issue that is not included in a timely filed statement of
points.  Tex. Fam. Code Ann. § 263.405(i) (West 2008); In re J.H.G., 302 S.W.3d 304, 306 (Tex. 2010).  However, an appellant may make a due process
claim and raise ineffective assistance of counsel on appeal when there is a
complete failure to file the statement of points, which precludes the reviewing
court from considering a meritorious complaint.  See In re J.O.A., 283 S.W.3d 336 (Tex. 2009); see also In re B.G., 317 S.W.3d 250, 256 (Tex.
2010).  We need not consider this point
of error because we find the evidence was sufficient to demonstrate Francisco
engaged in conduct which endangered the childrens physical or emotional
well-being.  





[14]On
appeal, this argument that the waiver was specific to Bullard was not
advanced.  Therefore, we do not address
it. 

 





[15]We further note that Edna would be unable to
demonstrate harm in light of cumulative testimony offered by Bullard that Edna
did not pass the February drug test, did not attend weekly counseling, was
arrested for DWI during the pendency of the case, drove with a suspended
license, and appeared under the influence at a parent-child visitation.





[16]To
distinguish Francisco Lopez from Edna Lopez, the mother of all of the children,
reference to these people will henceforth be made by their first names only.





[17]Francisco
appeared during the trial only for his testimony by telephone through an
interpreter.  He was unable to attend the
trial because of his deportation to Mexico.